IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| TRIBAL SOLUTIONS GROUP, LLC AND<br>TRIBAL COMMUNICATIONS, LLC | PLAINTIFFS |
| V. | CIVIL ACTION NO. 3:23-cv-00010-CWR-LGI |
| JOSEPH VALANDRA; CLAYTON WOOLEY;<br>JASE WILSON; MICHAEL FALOON;<br>READY.NET, INC.; AND TRIBAL READY, INC.<br>N/K/A TRIBAL READY, PBC | DEFENDANTS/<br>COUNTER-PLAINTIFFS |
| V. | |
| TRIBAL SOLUTIONS GROUP, LLC;<br>TRIBAL COMMUNICATIONS, LLC;<br>DAN C. DAVIS AND TC2, LLC | COUNTER-DEFENDANTS |
| *And* | |
| DAN C. DAVIS | COUNTER-PLAINTIFF |
| V. | |
| JOSEPH VALANDRA; CLAYTON WOOLEY;<br>JASE WILSON; MICHAEL FALOON;<br>READY.NET, INC.; AND TRIBAL READY, INC.<br>N/K/A TRIBAL READY, PBC | COUNTER-DEFENDANTS |

**MEMORANDUM IN SUPPORT OF TC PARTIES' OMNIBUS MOTION IN LIMINE**

#103364541v8

**INTRODUCTION**

The TC Parties make these motions *in limine* before the beginning of trial, before the voir dire examination of the jury, and before the parties have announced their readiness in open Court. The TC Parties respectfully ask the Court to instruct and direct that all attorneys, and through those attorneys, all parties and witnesses, not to refer to, make any statement concerning, ask any questions pertaining to, allude to, or put before the jury or jury panel in any form or manner whatsoever, whether directly or indirectly, any of the matters described below. The TC Parties specifically request that this Court prohibit all references to any of the matters enumerated below during jury selection as well.

In the alternative, the TC Parties respectfully request an order instructing all attorneys, parties, and witnesses to bring up all such matters with the Court, out of the presence of the jury and jury panel, so that the Court may determine the relevance and admissibility of such matters before they are injected into this case in the presence of the jury or jury panel.

**LAW AND ARGUMENT**

1. **Motion in limine No. 1: Personal comments in text messages between Dan Davis and Lora Ann Chaisson.**

The TC Parties move that any text messages between Dan Davis and Lora Ann Chaisson that are discussed and/or introduced into evidence be limited and/or redacted to exclude messages or portions of messages concerning personal matters unrelated to this suit. Dan Davis and Lora Ann Chaisson are close friends and often used terms of endearment that could be misinterpreted and used to embarrass and/or prejudice Davis and/or Chaisson. For example, terms like "Hunni," "darlin," and "sweet friend." These messages are not relevant to the claims or defenses at issue in this action and therefore should be excluded. *See* Fed. R. Evid. 401, 402. Furthermore, even if such evidence has any probative value, which is denied, it still should be excluded because any such

probative value is clearly substantially outweighed by the danger of unfair prejudice, confusing the issues, undue delay, and wasting time. *See* Fed. R. Evid. 403.

2. **Motion *in limine* No. 2: Dan Davis' personal wealth and spending habits, the net worth of Ready.Net and the other individual defendants, and the relative wealth and resources of the parties.**

During the deposition of George Rivera,[1] the Ready Parties' counsel asked several questions regarding the amount Dan Davis had spent purchasing Rivera's artwork, a Mediterranean cruise Rivera went on with Davis, and how often Davis flies on private jets as opposed to commercial. [Ex. A, Rivera Deposition, 113:24–114:13, 115:22–117:16, 120:3–121:1]. Then, the Ready Parties' counsel questioned Jeff Grubbe and Marshall Pierite during their depositions about Davis' private jet, how much he spends on his jet, and who had or had not flown on the jet. [Ex. B, Grubbe Deposition, 68:6–25; Ex. C, Pierite Deposition, 178:17–180:2]. The Ready Parties have also produced screenshots from Davis's Facebook account, including a picture checked in at Louis Vuitton and another at the Rosewood Hotel in Hong Kong. [Ex. I, TS_260715; Ex. J, TS_260716]. In addition, the Ready Parties have repeatedly made comments regarding the relative wealth of the TC Parties and the Ready Parties in their pleadings and in depositions. [*See* R. Doc. 184, p.7 ("Then, Mr. Davis made outlandish settlement demands for far more than Counter-Plaintiffs – startup companies and individuals – could ever pay.");[2] Ex. D, Davis Deposition, 110:6 (Q. "Is $4 million a lot of money to you?"); Ex. A, Rivera Deposition, 104:21–22 (Q. "Is $4 million a lot of money to you?")].

All of these instances give the TC Parties reason to believe the Ready Parties intend to mention or introduce evidence of Dan Davis' personal wealth and the relative wealth of the Ready

---

[1] George Rivera, Jeff Grubbe, and Marshall Pierite are all equity interest holders in TC2, LLC, the primary owner of Tribal Communications, LLC.
[2] Of course, any evidence of settlement discussions is inadmissible at trial as well under Rule 408.

Parties in order to prejudice the jury against awarding damages to the TC Parties. The TC Parties do not dispute that evidence of Dan Davis' and the Ready Parties' net worth are relevant to the claims for punitive damages in this case. However, comments and evidence regarding Dan Davis' personal wealth and spending, such as how much he spends on his art collection or on private jets, have absolutely no bearing on the claims or defenses at issue in this case. *See Friedman v. Medjet Assistance, LLC,* No. CV 09-7585, 2010 WL 9081271, at *12 (C.D. Cal. Nov. 8, 2010) ("Evidence or comments regarding plaintiff's wealth have no tendency to prove damages, and are therefore irrelevant."). Similarly, comments or evidence regarding the comparative financial performance and net worth of Ready.Net and the other individual defendants are irrelevant to the facts and issues at hand and would only be used in an attempt to garner sympathy with the jury.

Such evidence would invite the jury to treat Dan Davis and the rest of the TC Parties less favorably than the Ready Parties and would result in unfair prejudice, confusion of the issues, misleading of the jury, and undue delay. Fed. R. Evid. 403; *see also Hensley v. Bulk Transp.*, No. 2:13cv3-KS-MTP, 2014 U.S. Dist. LEXIS 75933, at *21 (S.D. Miss. June 4, 2014) (granting defendants' motion in limine to exclude arguments to the jury referencing the defendants' size or wealth, finding such arguments irrelevant); *McGinley v. Luv N' Care, Ltd.*, No. 3:17-CV-00821, 2023 U.S. Dist. LEXIS 174246, at *9 (W.D. La. Sep. 28, 2023) ("Plaintiffs' are precluded from making a 'David and Goliath' argument to the jury by introducing evidence regarding the size, value, or assets of Defendants in the abstract. Plaintiffs are also precluded from offering evidence comparing the size of Defendants' business to Plaintiffs' business. This evidence would create an unfair characterization of Defendants as a 'Goliath,' against Plaintiffs as 'David.'"). The Court should, therefore, preclude counsel and the parties from making comments or introducing evidence regarding the comparative wealth of the parties during trial. The Court should further preclude

counsel and the parties from mentioning the wealth and/or net worth of Davis or any of the Ready Parties during the liability and compensatory damages phases of the trial. This evidence should be excluded as irrelevant under Rule 401 and thus inadmissible under Rule 402 as well as prejudicial and excluded under Rule 403.

3. **Motion *in limine* No. 3: Evidence or suggestions that Dan Davis is forcing Ready Parties to spend money unnecessarily to defend themselves in an attempt to bankrupt or "destroy" the Ready Parties, or any speculation as to Dan Davis' motivations for filing this lawsuit.**

The Ready Parties have repeatedly made statements suggesting that the TC Parties' have filed and continued to pursue their claims, not in an effort to defend their rights with respect to the wrongful conduct of the Ready Parties, but instead in attempt to exact revenge on the Ready Parties. [*See, e.g.*, R. Doc. 59, ¶109 ("Following through on his threats, Davis filed the instant lawsuit."); *id.* at ¶112 ("After filing the lawsuit, Davis and TC have sought to interfere with and carry out on Davis' threat to 'destroy' Tribal Ready's business."); R. Doc. 184, p.6 ("After the Fifth Circuit denied Plaintiffs' request for injunctive relief, Counter-Defendants continued their quest to destroy Defendants."); *id.* ("While [Davis] could not say what he hoped to accomplish with this litigation, he conceded that prolonging litigation to bankrupt defendants was not off the table."); Ex. A, Rivera Deposition, 105:1–11 (Q. "Is that what this lawsuit is about, to go try to destroy Clay and Joe and this new company?"); *id.* at 105:25–106:1 (Q. "Is that what this lawsuit is about, is whipping their ass?"); Ex. C, Pierite Deposition, 184:25–185:25 (Q. "So did he [Dan Davis] want to exact revenge through filing the lawsuit? . . . So other than vindicating himself or feeling done wrong, did he tell you anything else that he hoped to accomplish?")].

The Ready Parties seek to use an alleged angry outburst by Dan Davis in a conversation with Clay Wooley that he would "destroy" the Ready Parties and an out-of-context statement from

Davis' deposition[3] to confuse the jury and undermine the merit of the TC Parties' claims by characterizing the filing and pursuit of this lawsuit as a mechanism to bully the Ready Parties. Any suggestions or implications by the Ready Parties during trial that Dan Davis and the TC Parties have brought and are maintaining this suit purely for spite are improper speculation and irrelevant to the parties' claims and defenses. *See* Fed. R. Evid. 401.

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*, when considering the sham exception to the *Noerr-Pennington* doctrine, the Supreme Court held that if where a litigant had objective probable cause to bring the suit, then the litigant's subjective intent was irrelevant. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 63 (1993) ("[A] showing of malice alone will neither entitle the wrongful civil proceedings plaintiff to prevail nor permit the factfinder to infer the absence of probable cause."). The analysis is the same for a claim of malicious prosecution (*Trilogy Communs., Inc. v. Times Fiber Communs.*, Inc., 47 F. Supp. 2d 774, 778 (S.D. Miss. 1998)) and for a claim of a bad faith filing made under the DTSA. *Source Production. & Equipment Co. v. Schehr*, 2020 U.S. Dist. LEXIS 149827 at *11–12 (E.D. La. August 18, 2020) ("A court may only award fees when . . . 'the claim was entirely baseless or specious'"). In essence, the Ready Parties are arguing that the TC Parties' suit is a "sham" instituted solely to drive them out of business, but this Court has already found probable cause in its order denying the motion for preliminary injunction. [R. Doc. 44, p. 3 ("The Plaintiffs are substantially likely to succeed on the merits, as the alleged corporate theft is memorialized by dozens of contemporaneous emails sent via the Plaintiffs' own email servers.")].

---

[3] While in his deposition, Dan Davis said that he could bankrupt someone, he did not say that he wanted to bankrupt anyone or that it was his goal to bankrupt the Ready Parties. [Ex. D, Davis Deposition, 217:10–18; *see also id.* at 214:23–25 ("So do I think that this [litigation] is the way I would have liked for this to turn out? Absolutely not; absolutely not.")]

Therefore, even if the Ready Parties could prove that this suit was borne out of Dan Davis' anger at the Ready Parties for betraying him and destroying his business, the subjective intent of the parties has no bearing on the propriety of the TC Parties' claims. *See* Fed. R. Evid. 401. Furthermore, even if such implications had any probative value, which is denied, this evidence still should be excluded because any such probative value is clearly substantially outweighed by the danger of unfair prejudice, confusing the issues, undue delay, and wasting time. *See* Fed. R. Evid. 403; *see also Thomas v. Hill*, No. 13-2326, 2014 U.S. Dist. LEXIS 123640, at *6–7 (W.D. La. Aug. 29, 2014) (excluding evidence of a Facebook post that said, "I,M SUING THE CRAP OUT OF HIM," among other inflammatory statements, because "[i]f the post is allowed into evidence, the obvious danger is that the jury may well be swayed by improper considerations because of the angry nature of the post, rather than focus on its limited relevance").

4. **Motion *in limine* No. 4: The amount of money spent by the Ready Parties and/or by the TC Parties in prosecuting and defending this case.**

The Ready Parties have made statements on multiple occasions referring to the amount of money the TC Parties have spent on this litigation. [*See, e.g.*, Ex. D, Davis Deposition, 115:18–116:6 ("At the bottom of the page, it assumes $500,000 for this lawsuit in 2023 alone. How accurate is that?"); R. Doc. 184, p.6 ("It is not disputed that Mr. Davis told Clay Wooley that if he [Mr. Davis] would spend $1 million to build a company that he would spend $5 million to tear one down. . . . That is precisely what he has done."); Ex. C, Pierite Deposition, 183:19–184:1]. Courts have universally held that statements or evidence regarding the expense of the litigation at issue are irrelevant and highly prejudicial and therefore should be excluded. *See, e.g.*, *Affordable Care, LLC v. JNM Office Prop., LLC*, No. 1:19cv827-HSO-RPM, 2022 U.S. Dist. LEXIS 16600, at *8–9 (S.D. Miss. Jan. 31, 2022) (holding that any evidence or other references to the cost of the defense or prosecution of the case and either party's comparative wealth or status should be excluded, even

7

if marginally relevant, because of the "substantial risks" of unfair prejudice, confusion, misleading the jury, and waste of time); *Hull v. Ford*, No. C-05-43, 2008 U.S. Dist. LEXIS 3686, at *5 (S.D. Tex. Jan. 17, 2008) ("Statements regarding defendant's expenditure of resources in this case cannot be relevant because they do not tend to make any material fact more or less probable."); *Dinsay v. Rn Staff Inc.*, No. 1:19-cv-00907-TWP-DML, 2021 U.S. Dist. LEXIS 119939, at *13–14 (S.D. Ind. June 28, 2021) ("References to the amount of money or time spent . . . in the defense of this action, including attorneys' fees, expenses, and costs of litigation . . . are clearly irrelevant or unfairly prejudicial"); *Bishop v. Anderson*, No. 5:16-CV-128-TBR, 2018 U.S. Dist. LEXIS 159636, at *9 (W.D. Ky. Sep. 18, 2018) ("Here, the Court can determine no way in which references to . . . Defendants' defense costs might offer any probative value at trial."). The present case is no different. The amount the parties have spent on this litigation has no bearing on either parties' liability or defenses, and introduction of such evidence would result in unfair prejudice, confusion of the issues, misleading of the jury, and undue delay. Fed. R. Evid. 401–403.

5. **Motion *in limine* No. 5: The TC Parties' public records requests regarding state contracts with Ready.net.**

In their pleadings, the Ready Parties assert that "Plaintiffs used the information learned about Ready.net's business to send public records requests to Ready.net's key customers, all of which are unrelated to TC's or Tribal Ready's business (and which TC is incapable of servicing) in a deliberate attempt to threaten Ready.net's very existence." [R. Doc. 184, p.7]. As members of the public, the TC Parties were entitled to file public record requests to determine the states with which Ready.net had contracts and how much money it was being paid by those states. *See Lawson v. City of Jackson*, 349 So. 2d 724 (Miss. 2022) (litigant entitled to use public records requests to obtain information in litigation). The public records requests were properly used as a mechanism

8

to discover public financial information about Ready.net and were not made for any improper purpose.

The public records requests submitted by the TC Parties bear no relevance to any of the claims or defenses at issue in this case. The Ready Parties want to argue that the TC Parties made the public record requests to harm Ready.net as part of their continued effort to paint Dan Davis and the TC Parties as bullies looking to victimize the Ready Parties. The introduction of this evidence presents a significant risk of unfair prejudice, confusion of the issues, misleading of the jury, and undue delay and should be excluded. Fed. R. Evid. 403.

6. **Motion *in limine* No. 6: The TC Parties' lack of compliance with the TC and TSG operating agreements.**

The Ready Parties dedicated significant portions of the depositions involved in this case questioning the deponents about TSG and TC's alleged lack of compliance with their Operating Agreements. For example, Dan Davis had ultimate control of TC because he owned or controlled all voting interests of TC. Because of this ultimate control, Davis was able to make decisions for TC such as pursing this lawsuit without ensuring that he appointed a TC Board as required by the TC Operating Agreement. In depositions, the Ready Parties attacked TC and Davis for not properly following the TC Operating Agreement to appoint a Board and obtain approval by that Board to file and continue this lawsuit. [Ex. A, Rivera Deposition, 104:14–27; Ex. C, Pierite Deposition, 184:11–24]. While the requirements of the TC Operating Agreement were not initially met, those deficiencies were later corrected by Davis when a TC Board was appointed which passed unanimous resolutions approving all actions and mooting the arguments made by the Ready Parties. [TSG-TC_00113620–24; TSG-TC_0113660–63]. Furthermore, whether TC followed the TC Operating Agreement is wholly irrelevant to and provides no defense to the Ready Parties' breaches of fiduciary duty, alleged emotional distress, or defamation, or the other claims and

defenses at issue in this case. *See* Fed. R. Evid. 401. Furthermore, the Ready Parties do not have standing to raise non-compliance with either the TC or TSG Operating Agreements. Compliance and/or non-compliance with the Operating Agreements is not relevant under Rule 401. Even if there is any relevance, any probative value that such evidence may offer is substantially outweighed by the risk of confusion, prejudice, and waste of time. *See* Fed. R. Evid. 403.

7. **Motion *in limine* No. 7: Valandra's salary was paid by Southern Research Group, and therefore Valandra was confused as to who his employer was.**

Evidence or discussions of the vendor listed on Valandra's paychecks–and any alleged confusion by Valandra about the identify of his employer as a result—should be excluded from trial. In their Answer, the Ready Parties alleged that "Valandra ostensibly joined TC as Senior Vice President of Business Development and Strategy in September 2021. . . . In fact, Southern Research Group paid Valandra for his services in at least 2022." [R. Doc. 59, ¶39]. There is no issue of material fact as to whether Valandra was employed by Tribal Communications, and therefore no probative value is offered by evidence of Valandra's paychecks being issued by Southern Research Group rather than Tribal Communications. Therefore, this evidence should be excluded as irrelevant. *See* Fed. R. Evid. 401, 402. Further, to the extent this evidence does present any probative value, which is denied, such value is far outweighed by the risk of unfair prejudice, confusion of the issues, misleading of the jury, and undue delay. Fed. R. Evid. 403.

8. **Motion *in limine* No. 8: Tribal Ready is "better for Indian Country" than Tribal Communications.**

Any suggestions or implications that the misappropriation of trade secrets and breaches of fiduciary duty by the Ready Parties in order to form Tribal Ready was the "best thing for Indian Country" [R. Doc. 59, ¶96] are irrelevant, highly prejudicial, and should be excluded at trial. [*See also* Ex. C, Pierite Deposition, 186:2–4 ("But did Mr. Dan ever tell you that he thought filing this lawsuit would be good for Indian Country?")]. Whatever advantages Tribal Ready allegedly had

10

or has over Tribal Communications are irrelevant to the actual questions at issue in this case—namely, whether the Ready Parties misappropriated the TC Parties' trade secrets or breached their fiduciary duties—and therefore should be excluded at trial. *See* Fed. R. Evid. 401, 402. Additionally, these suggestions that the Ready Parties were acting in the best interest of underserved Native American tribes and the TC Parties were not could sway the jury to make a decision based on emotion rather than the facts of the case. *See* Fed. R. Evid. 403.

9. **Motion *in limine* No. 9: Whether Tribal Communications was "Native-owned and -controlled."**

From the outset of this litigation, the Ready Parties have again and again emphasized that Tribal Communications was not "Native-controlled" and that this was important to the Ready Parties because "establishing Native ownership and control is quintessential to being awarded government grants for broadband access development." [R. Doc. 59, ¶33]. Yet, the Ready Parties have failed to point to a single rule or regulation that would require Tribal Communications, or any entity seeking to fulfill the same services as Tribal Communications, to represent or certify that it was Native-owned and Native-controlled. Furthermore, when asked about the meaning of "Native-owned" in their depositions, Jeff Grubbe, Marshall Pierite, and George Rivera—each a Native American with an extensive career working with Tribes—gave three different definitions. [*See* Ex. B, Grubbe Deposition, 30:11–25 (at least one Native on the board or part-owner); Ex. A, Rivera Deposition, 22:9–24:1 (any Native ownership, no matter the percentage); Ex. C, Pierite 14:1–7 (usually 51% ownership, but based on who's establishing the criteria)]. It is clear that there is no universal requirement for any sort of Native ownership or control that would have prevented Tribal Communications from being able to fulfill its purpose, as the Ready Parties assert. And even if there was such a requirement, Joe Valandra admitted in his deposition that he never raised the

11

issue of Native-ownership or control to Dan Davis until after he had resigned. [Ex. E, Valandra Deposition, 135:25–136:7; *see also* Ex. F, Davis PI Testimony, 42:2–15].

Like the issue of whether Tribal Ready is "best" or better for "Indian Country," the Ready Parties seek to use this Native-control rhetoric to distract from the relevant facts of this case and to paint the TC Parties as villains. The ethnicities of the controlling members of the parties in this case have no tendency to make any fact of consequence any more or less likely to be true, and therefore should be excluded as irrelevant. *See* Fed. R. Evid. 401, 402. To the extent that such comments or evidence present any probative value, which is denied, this value is clearly outweighed by the highly prejudicial nature of such comments, in addition to misleading the jury and wasting time. *See* Fed. R. Evid. 403.

**10. Motion *in limine* No. 10: Tribal Ready's poor financial performance after the Ready Parties' breach of duty.**

In his expert reports dated May 17, 2024 and August 20, 2024, the Ready Parties' damages expert Sean Sarsfield repeatedly argues in favor of applying the Book of Wisdom approach, an ex post methodology that disregards Defendant Valandra's financial forecasts made at the time that the Ready Parties decided to steal the corporate opportunity, and instead relies on the after-the-fact (post-filing of this lawsuit) financial performance of Tribal Ready. [*See, e.g.*, Ex. G, Sarsfield May 17 Report, pp. 2–3, 7–8, 15–17; *see also* Ex. H, Sarsfield August 20 Report, pp. 10–11, 13]. According to Sarsfield, the opinions of the TC Parties' expert Richard Eichmann are invalid and irrelevant because they do not apply the Book of Wisdom approach, and Sarsfield's opinions are valid and relevant because he does apply it. *Id*.

In essence, the Ready Parties argue that their failure to make a profit is relevant to the TC Parties' claims for lost profits. But the TC Parties are not seeking damages for lost profits; they are seeking the value of the business that was stolen from them at the time it was stolen, a calculation

12

that takes into account the *forecast* of future profits made at the time of the breach. *See Lane v. Lampkin II*, 175 So. 3d 1222, 1228 (Miss. 2015) (quoting *Aqua-Culture Techs., Ltd. v. Holly*, 677 So. 2d 171, 183–84 (Miss. 1996)). The Ready Parties' apparent confusion over this point illustrates exactly why it would be unfairly prejudicial to allow the introduction of evidence regarding Tribal Ready's actual profits post-breach. In addition to the Book of Wisdom's universal rejection as an unreliable methodology in business-valuation practice, it will confuse the jury as to the appropriate measure of damages and prejudice the jury against granting an appropriate compensatory damages award.

Because the Book of Wisdom approach is rejected by experts as being inappropriate in a business-valuation calculation, such evidence has no tendency to make any fact of consequence any more or less likely to be true, and therefore should be excluded as irrelevant. *See* Fed. R. Evid. 401, 402. To the extent that such comments or evidence present any probative value, which is denied, this value is clearly outweighed by the highly prejudicial nature of such comments, in addition to misleading the jury and wasting time. *See* Fed. R. Evid. 403. The TC Parties refer to their briefs on their *Daubert* Motion to Exclude in Part the Expert Testimony of Sean Sarsfield for further argument on the impropriety of such evidence and the risk of prejudice and jury confusion. [R. Doc. 163, 190].

## CONCLUSION

For the reasons stated above, the TC Parties respectfully request that the Court grant their Omnibus Motion *in Limine* and enter an Order excluding the Ready Parties from referring to, making any statement concerning, asking any questions pertaining to, alluding to, or putting before the jury or jury panel in any form or manner whatsoever, whether directly or indirectly, any of the matters described above.

#103364541v8

This the 10th day of January, 2025.

        Respectfully submitted,

        TRIBAL SOLUTIONS GROUP, LLC;
        TRIBAL COMMUNICATIONS, LLC;
        DAN C. DAVIS; AND TC2, LLC

        By Their Attorneys,

        JONES WALKER LLP

        By: *s/ Neville H. Boschert*
            NEVILLE H. BOSCHERT

Neville H. Boschert (MS Bar No. 3697)
 nboschert@joneswalker.com
Adam Stone (MS Bar No. 10412)
 astone@joneswalker.com
Kaytie M. Pickett (MS Bar No. 103202)
 kpickett@joneswalker.com
JONES WALKER LLP
3100 North State Street, Suite 300
Jackson, MS 39216
Tel.: (601) 949-4900; Fax: (601) 949-4804

## CERTIFICATE OF SERVICE

I, Neville H. Boschert, do hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

This, the 10th day of January, 2025.

        *s/ Neville H. Boschert*
         NEVILLE H. BOSCHERT

#103364541v8